[816 NYS2d 58]

ARIELA BRAUN et al., Appellants, v 941 PARK AVE., INC., et al., Respondents, and DAVID MOORE et al., Respondents.

First Department, June 6, 2006

## APPEARANCES OF COUNSEL

*Randall T. Sims,* New York City, for appellants.

*Rosen & Livingston,* New York City (*Bruce A. Cholst, Benjamin R. Tessler* and *Albert A. Levy* of counsel), for 941 Park Ave., Inc., and others, respondents.

*Rosenberg & Estis, P.C.,* New York City (*Jeffrey Turkel* of counsel), for David Moore and others, respondents.

### OPINION OF THE COURT

BUCKLEY, P.J.

This declaratory judgment action arises out of a Park Avenue cooperative apartment building and the uncooperative behavior of certain of its resident shareholders.

The building consists of three vertical "lines" of apartments. One elevator from the lobby of the doorman building serves the "B" and "C" line apartments, some of which are duplexes. On some floors only one apartment has a main entrance, on the others the two apartments' doors are located on opposite sides of the long end of a 6-foot-by-13-foot vestibule landing.

Another elevator from the lobby serves the "A" line apartments and apartment 1B, all of which are duplexes. Each "A" line apartment has a main entrance on its lower level, consisting of the "public" rooms, such as the living room and dining room, and a second entrance on its upper level, consisting of the "private rooms" or bedrooms. The elevator opens to a 6-foot-by-6½-foot vestibule landing, on which there is the entrance to one apartment's public rooms, the door to the private rooms of the apartment below, and a service/fire exit to the stairwell.

The configuration of apartment 1B, occupied by plaintiff Ariela Braun and her husband, differs from all the rest. Under the

original building design, it was a mixed professional/residential unit, with an entrance to the professional suite directly from the street, and access to the upper level, the residential quarters (including the "public" residential rooms), via the "A" line elevator landing hallway on which was also situated the main entrance to apartment 2A, occupied by defendants David and Lori Moore. The Brauns converted apartment 1B to full residential use, with the bedrooms on the lower level, and the entertaining rooms on the upper level. Thus, the main entrances of both apartments 1B and 2A were on the same elevator landing, unlike the remainder of the "A" line apartments. However, even before apartment 1B was converted, the family residing there and their guests were entitled to unrestricted access to the apartment from the vestibule shared with apartment 2A.

In 1983, the cooperative enacted House Rule 28, which provided that elevator vestibules would be "under the jurisdiction" of the apartment whose lower level (public rooms) was situated there. The occupants of such primary apartment would have the right to decorate the vestibule as they wished and would be responsible for its cleaning and maintenance. The occupants of the apartment whose upper level (bedrooms) was located on a landing, and their immediate family, would be permitted access through the vestibule, but other visitors would not be allowed without the consent of the primary apartment. In addition, the occupants of a nonprimary unit would be precluded from leaving umbrellas and other objects in the vestibule, or receiving mail or other deliveries there.

The occupants of apartments 2A and 1B shared their common vestibule without incident until the Moores and Brauns moved in. The Moores, who bought their apartment in 1996 under the impression that they would have primary use of the landing at issue, redecorated the vestibule, with the approval of the cooperative's board of directors, painting their own door a rich wood color, and the doors to apartment 1B, the service/fire exit, and the elevator in matching bland tones. The Brauns, who acquired their apartment in 1997 with the belief that they would enjoy unfettered use of the vestibule, converted their unit from mixed professional/residential to exclusively residential, as noted *supra*.

After the Moores and the Brauns took up residency, they learned of each other's conflicting views on vestibule rights. The Moores, who referred to the vestibule as their "front porch," claimed primary jurisdiction and argued to the board

that the hallway was too small to accommodate both apartments' umbrella stands, tables, snow boots, uncollected packages, and other items. In addition, the Moores complained that visitors of the Brauns wandered into their apartment or rang their doorbell; the Moores suggested that the Brauns' guests be sent from the lobby and around the corner to apartment 1B's street entrance, even though it would require such visitors to climb a steep staircase to reach the apartment's upper-level "public" rooms. The Brauns asserted equal rights to share the vestibule, and took it upon themselves to repaint their front door so that it would no longer resemble a service entrance.

The board asked the neighbors to work out their differences, and attempted a mediation, but the dispute became more acrimonious. Eventually, the board enacted a modification to House Rule 28 to provide that the Brauns could receive guests via the vestibule, but only if "personally accompanied by a member of [the building's] staff." The board interpreted the unaltered portion of the house rule as prohibiting the Brauns from storing personal items in the area and as giving the Moores the exclusive right to design the decor, including the color of the doors; mail, newspapers, and other deliveries would have to be left for the Brauns at a third door, leading from their kitchen to the service/fire corridor.

Since the parties agree that the cooperative's governing documents require that its house rules, including modified House Rule 28 at issue, be "reasonable," and as such, must be reviewed under a standard of reasonableness, rather than the business judgment rule ordinarily applicable to cooperative board actions (see *Ludwig v 25 Plaza Tenants Corp.*, 184 AD2d 623 [1992]), we need not reach the question of what language must be included in a proprietary lease drafted before *Matter of Levandusky v One Fifth Ave. Apt. Corp.* (75 NY2d 530 [1990]) in order to impose upon a cooperative board a requirement more stringent than the business judgment rule.

■ Due to the unique layout of apartments 1B and 2A, a specialized house rule, particular to them, was not discriminatory, and indeed was necessary. However, that part of the board's modified house rule placing the Brauns' guests under interdict unless "personally accompanied by a member of Lessor's staff" is unreasonable. The rule serves only to convey the impression that, alone of all the building's residents, the Brauns' friends and relatives are of such unsavory character that they will not be permitted inside without an escort. To the extent the Moores

are concerned about the security or privacy implications of someone unknown to them wandering into their apartment, they have recourse to the self-help remedy of locking their door. As to the nuisance the Moores might suffer from another resident's guests ringing or knocking on their door, there is a panoply of reasonable options that would not impair the market value of the Moores' apartment or otherwise tarnish its luxury status. For example, a tasteful marker could be affixed to, or next to, the doors indicating the apartment numbers or the residents' names. In the alternative, the Moores' door might be painted one color, the Brauns' another, and the service and elevator doors a third. Barring the existence of three respectable colors in the paint spectrum or a fashionable marker design, the Brauns and the Moores might wait in their respective entranceways for their guests during the interim between the doorman's calling up and the elevator door's opening. Insofar as the Moores might find it "embarrassing and disturbing" to open "the door to retrieve mail and hav[e] a stranger staring at them," as they remonstrated to the board in one letter, even the one-man building escort they advocate would not shield their vision from other people in the hallway.

The remainder of the modified house rule, pertaining to the use of the vestibule for leaving strollers, wet umbrellas, tables, sundry receptacles, and deliveries, has a reasonable basis, considering the constricted area, notwithstanding the fact that the prior tenants were able to coexist in clutter-free harmony.

Because plaintiffs, the Brauns, in effect, merely sought a declaration as to their rights under the proprietary lease, they are not entitled to attorneys' fees under the lease (see *Salvato v St. David's School*, 307 AD2d 812, 813 [2003]; *Spinale v 10 W. 66th St. Corp.*, 193 AD2d 431, 432 [1993]). In any event, the Brauns have not "prevailed" for purposes of attorneys' fees under the proprietary lease.

Accordingly, the judgment of the Supreme Court, New York County (Walter B. Tolub, J.), entered June 29, 2004, which, insofar as appealed from, dismissed the complaint as against 941 Park Ave., Inc. and its board of directors and officers, should be reversed, on the law and the facts, without costs, the complaint reinstated and an amended judgment entered, declaring that that portion of the house rule pertaining to visitors is unreasonable and that the balance of the house rule is reasonable. The appeal from the order of the same court and Justice, entered August 28, 2003, should be dismissed, without costs.

SAXE, J. (concurring in part and dissenting in part.) The conflict between the residents of two adjacent units in a Park Avenue cooperative, both of which units have main entryways that open onto a shared vestibule, presented a unique problem for the cooperative's board to resolve. The solution arrived at by the board was to rely upon a previously enacted house rule, modified so as to add a provision that applies solely to the vestibule in question. Because the rule the board relied upon, as applied to this situation, gives one shareholder extra benefits while depriving the other of even the ordinary benefits of coop ownership provided to every other resident, I am unable to view this resolution as reasonable.

Generally, the acts of a cooperative's board of directors are reviewed pursuant to the business judgment rule, which "prohibits judicial inquiry into actions of corporate directors 'taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes' " (*Matter of Levandusky v One Fifth Ave. Apt. Corp.*, 75 NY2d 530, 537-538 [1990], quoting *Auerbach v Bennett*, 47 NY2d 619, 629 [1979]). Therefore, absent a showing of bad faith, self-dealing, or some other breach of fiduciary duty, a court normally may not reach the issue of whether an act of the board is reasonable (*see id.* at 538-539). However, where, as here, a cooperative's governing documents require that house rules must be reasonable, judicial review of the challenged house rule must address whether it meets the more exacting standard of reasonableness (*see Ludwig v 25 Plaza Tenants Corp.*, 184 AD2d 623 [1992]).

The determination of a rule's reasonableness requires consideration of its relationship to the legitimate purposes of the cooperative or condominium, and its impact on the respective parties:

> "While the courts that have utilized this standard have not elaborated on its doctrinal basis, reasonableness review resembles an equity court's balancing of the relative hardships among the parties. But, if a challenged rule bears a relationship to the legitimate purposes of the co-operative or condominium, the board's discretion in promulgating the rule will ordinarily not be deemed arbitrary and capricious" (*Garrison Apts. v Sabourin*, 113 Misc 2d 674, 677 [1982] [internal quotation marks and citation omitted], quoting Note, *Judicial Review of Condomin-*

*ium Rulemaking,* 94 Harv L Rev 647, 658 [1981]
and citing *Hidden Harbour Estates, Inc. v Norman,*
309 So 2d 180, 181-182 [Fla 1975]).

It is therefore appropriate to consider the relative hardships the rule imposes upon the parties, as well as whether the rule bears a relationship to any legitimate purpose of the cooperative.

This Park Avenue building, the lobby of which is staffed by a doorman as well as a "hallway man" 24 hours a day, contains three lines of apartments, served by two passenger elevators located in the main lobby. The front elevator primarily serves the "A" line of apartments, which are duplex apartments that have their living quarters on their lower level and their bedrooms on the upper level. The "A" line elevator opens at each floor onto a 6-foot-by-6½-foot vestibule from which, beginning at the third floor, a door leads to each "A" line apartment's main entryway, and another door leads to the upper level "private" rooms of the apartment below.

A separate elevator in the rear of the lobby serves the "B" and "C" lines, and opens onto a 6-foot-by-13-foot vestibule. Some of these apartments are duplexes; others are not. So, at some floors there is only one main apartment entrance reached from the vestibule outside the elevator, while on other floors the entryways to the main living quarters of both the "B" and the "C" apartments are on opposite sides of the same vestibule.

Apartment 1B differs from all the other apartments in the building. From the time of the building's initial construction in 1928, this unit was designed for mixed professional/residential use. The first floor of this duplex unit was built as a medical or professional suite, and the second floor, connected to the first by an internal staircase, was built as an ancillary "Classic 6" residence. The professional suite was constructed so as to have its own separate entrance directly from 81st Street, while the entrance to the living quarters of the unit was reached from the vestibule at the second floor of the "A" line elevator, where the main entrance to apartment 2A is also located. Thus, 2A is unlike the remaining "A" line apartments, in that the small vestibule outside of its main entryway is also the site of the main entryway to the living quarters of another apartment, that of 1B. This has been the case from the time the building was constructed.

The cooperative's House Rule 28, as enacted in 1983, served to give primacy over vestibules to the apartment whose lower floor was located at the vestibule. The rule's phrasing assumed

that an apartment's lower level contained its public rooms and its upper level contained its private rooms:

"The elevator lobby giving ingress to and egress from the lower floor of a Lessee's apartment . . . shall be under the jurisdiction of that Tenant and may, subject to the provisions of House Rule Three, be decorated in such manner as he or she determines. The tenant shall also have responsibility for cleaning and maintaining that elevator lobby.

"An occupant of the apartment below a Tenant's apartment . . . whose door to the upper floor of an occupant's apartment opens on to a tenant's lobby, shall have access through that Tenant's lobby only for use by members of the Occupant's immediate family. An Occupant may not, without the specific consent of the Tenant, use that door from his upper floor through the Tenant's lobby for visitors or for any other purpose. The Occupant shall under no circumstances leave overshoes, umbrellas, packages or any other objects of the Tenant, have newspapers, mail, laundry or packages delivered through the Tenant's lobby."

Notably, the terms of original House Rule 28 were not quite applicable to a number of vestibules. As to those vestibules where the main entryways to both a "B" and "C" line apartment are on opposite sides of the hallway, historically, these were understood to be shared vestibules, and treated as such without incident, notwithstanding House Rule 28. The rule was similarly ill-suited to the unique arrangement of 1B/2A, since the rule clearly contemplated that the "occupants" (the resident with limited rights to use of a vestibule) had their main living quarters—and entrance—on the floor below the living quarters of the "tenant's" apartment. But until this dispute arose, there was no suggestion that House Rule 28 applied to the 1B/2A vestibule; rather, as with the shared vestibules on the "B"/"C" line, prior residents of 2A and 1B shared their vestibule without incident for decades.

Then, the Moores purchased apartment 2A in 1996 and the Brauns purchased 1B in 1997. The Brauns renovated 1B, with the board's cooperation, so as to make it solely residential, replacing the medical offices on the lower level with private rooms, and leaving the main living quarters as they had been, on the upper level. Importantly, this renovation did not alter the location of the main entryway to 1B's living quarters, which had always been located at the second floor of the "A" line elevator.

Upon completing their renovations in March 1998, the Brauns moved in, and were surprised to discover that the Moores had, with the cooperative's approval, redecorated the vestibule outside their front door, including repainting the Brauns' front door to match the bland color of the service door and elevator, in contrast to the deep wood tones of the Moores' own front door. While the Brauns attempted to assert that they had an equal right to treat the vestibule as their own, and for their front door to appear as such rather than as some sort of service door, the Moores wrote to the board, requesting that the Brauns' use of the vestibule be sharply curtailed. In a letter dated May 28, 1998, the board advised the Moores that it saw no basis for restricting the Brauns' access; in fact, it specified that the tenant/shareholder before the one that sold to the Brauns had used the vestibule as "a primary residential means of egress."

Nevertheless, the dispute continued and escalated. The Moores said they had been assured before purchasing 2A that the occupants of 1B had not used the vestibule as a primary entrance, and therefore it would be unfair to force them to treat it as a shared vestibule. They complained that visitors sent up to the Brauns' apartment had by mistake entered their apartment instead. They also complained of packages and mail being left at the Brauns' doorway, and of the Brauns' placement of personal items such as a small umbrella stand in the vestibule. Essentially, while the Brauns insisted that the vestibule must be treated as a shared one, the Moores continued to take the position that they had primary rights to the vestibule, and that the Brauns' street (non-lobby) entrance, rather than the second floor vestibule, must be treated as their main entrance.

Although the board had initially responded to the dispute with the assertion that the vestibule was shared and the parties must work things out, as a result of the escalating intensity of the imbroglio between the Brauns and the Moores, the board revisited the issue, and ultimately concluded that the Moores had voiced valid concerns regarding clutter, overcrowding, security and privacy. It modified House Rule 28 so as to add new restrictions on the Brauns' use of the common vestibule. Specifically, the board added the following to House Rule 28: "With respect to the Tenant's lobby appurtenant to Apartment 2A, the Occupant [i.e. the Brauns] may receive guests when they are personally accompanied by a member of Lessor's staff. Lessor will provide a staff escort for Occupant's guests at all reasonable times . . . ." Pursuant to other provisions of House Rule

28, the Brauns were instructed that their second floor kitchen service entrance would be used for delivery of mail and packages, and was the proper location for them to store personal items.

The Brauns challenge this house rule as imposing unreasonable and unconscionable restrictions on their tenancy. They contend that as applied, the rule simply discriminates against them, taking from them rights to which they were entitled, and granting special privileges to the Moores, not for any reasonable purpose of the cooperative, but simply because that was the only way to appease the Moores.

Initially, the board's adoption of a rule applicable to only one vestibule is not in itself unreasonable or improper. There is no requirement that a house rule must apply universally throughout the building. Such rules must only be reasonably related to their stated purpose, consistent with the law, and not destructive of any vested right (see Note, *Promulgation and Enforcement of House Rules*, in Symposium on the Law of Condominiums, 48 St John's L Rev 1132, 1133 [1974]; *Vernon Manor Co-op. Apts., Section I v Salatino*, 15 Misc 2d 491, 494-495 [1958]). Where a dispute is particular to only certain individuals, and both parties repeatedly look to the board to resolve the dispute, the enactment of a particularized provision is proper and necessary. Here, the adoption of a modification to the prior house rule was an appropriate approach to resolving this particular conflict. The board was essentially forced to make some ruling; its initial direction that the parties work out an arrangement sharing the vestibule had no effect.

However, that a particularized resolution was necessary does not automatically render the board's action reasonable. In my view, it was not.

The majority's limited disapproval of the rule as modified seems to be insufficient. While I agree that the newly adopted provision requiring an escort for the Brauns' guests is unreasonable as well as discourteous, it is just as unreasonable to give the Moores complete control of the vestibule. Most importantly, while the Moores obtained all the benefits of an exclusive vestibule in the "A" line of duplex apartments, the Brauns are relegated to second-class status that denies them the use of a front door as every other building resident understands that term.

Every other building resident has a front door recognizable as such; the Brauns' front door has been painted to create the

impression in the mind of visitors (or future potential purchasers) that it is a service entrance. Worse, the Moores retain total discretion over whether to alter the door's appearance so as to acknowledge it as the Brauns' main entryway. Additionally, everyone else is entitled to leave small personal items, such as wet shoes and umbrellas, outside their front door; the Brauns may not. All others may have their mail and packages left at their front door; the Brauns' are left at their kitchen service entrance, near their trash cans.

Although the vestibule leading to 2A and 1B is half the size of the shared vestibules in the "B"/"C" line of apartments, the same premise should be applied to it. When two units have their main entryway on one vestibule, the residents of both must be entitled to leave reasonable amounts of personal items outside their front doors as they enter, whether the space they have to use is six feet long or three feet long. In short, both front doors must be treated as front doors.

The Moores' assertion that because 1B is a "maisonette" apartment, its ground floor entrance must be viewed as its true front door, is based upon wishful thinking rather than the historical structure and use of 1B. Indeed, the board acknowledges that it would be unreasonable—not to mention potentially unsafe—to require the Brauns to treat their (non-lobby) street access door, leading to what are now private rooms in the lower level of their unit, as the front door of their apartment. Yet, the cumulative effect of the board's determination is to effectively deprive unit 1B of any true front door, as that term is understood by all the other residents of this Park Avenue building.

The Moores say they were assured before they purchased their apartment that the vestibule primarily served apartment 2A, and was merely a secondary doorway for 1B. It appears that the board fostered that belief by approving the Moores' decoration plans for the vestibule, which plans asserted complete dominion over the vestibule and were designed to create the impression that only one of the two apartments had its front door there. Despite the board's approval and the Moores' misapprehension, it was nevertheless unreasonable for the board to have resolved the dispute so as to allow the Moores such total dominion over the shared vestibule, at the expense of the Brauns' basic rights, especially the right to a true front door.

The board's answer to the dispute was more than merely imperfect; it was so unbalanced as to be unfair. Ending a dispute, as useful and necessary as that may be, is not legiti-

mate if accomplished by appeasing one shareholder and imposing extraordinary restrictions on another. The application of the house rule here fails to meet the reasonableness standard that rules in this cooperative must satisfy, and should be rejected.

Finally, we note that on appeal the Brauns failed to address the trial court's finding that because neither they nor the Moores are a "prevailing party" in this matter, the cooperative is not responsible for the attorneys' fees of either. Accordingly, any such claim must be deemed abandoned. In any event, because the Brauns, in effect, merely sought a declaration as to their rights under the proprietary lease, they are not entitled to attorneys' fees under the lease (*see Salvato v St. David's School*, 307 AD2d 812 [2003]; *Spinale v 10 W. 66th St. Corp.*, 193 AD2d 431 [1993]).

MAZZARELLI and WILLIAMS, JJ., concur with BUCKLEY, P.J.; ANDRIAS and SAXE, JJ., concur in part and dissent in part in a separate opinion by SAXE, J.

Judgment, Supreme Court, New York County, entered June 29, 2004, reversed, on the law and the facts, without costs, the complaint reinstated and an amended judgment entered, declaring that that portion of the house rule pertaining to visitors is unreasonable. Appeal from order, same court, entered August 28, 2003, dismissed, without costs.